UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GINA F. VITTORIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLINK CHARGING CO., MICHAEL D. FARKAS, and MICHAEL P. RAMA,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**Jury Trial Demanded** |

Plaintiff Gina F. Vittoria ("Plaintiff"), by and through Plaintiff's attorneys, alleges upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States ("U.S.") Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Blink Charging Co. ("Blink" or the "Company") securities between March 6, 2020 and August 19, 2020, inclusive (the "Class Period").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      According to its most recent Annual Report filed on Form 10-K with the SEC, Blink purports to be "a leading owner, operator, and provider of electric vehicle ("EV") charging

1

equipment and networked charging services. Blink offers both residential and commercial EV charging equipment, enabling EV drivers to easily recharge at various location types." Blink common stock trades on the NASDAQ stock exchange under the ticker "BLNK." The Company is headquartered in Miami Beach, Florida.

3. Recently, Blink has touted the purported growth of its EV charging network, asserting that "drivers can easily charge at any of [Blink's] 15,000 charging stations." Over the last several months, Blink's stock price has climbed from trading between approximately $1.40 to $3.12 per share, to an intraday high of $14.58 per share on July 30, 2020.

4. On August 19, 2020, analyst Culper Research ("Culper") published a report entitled "Blink Charging Co. (BLNK): You Won't Miss It." Culper wrote, in relevant part:

> [W]e believe that [Blink] has vastly exaggerated the size of its EV charging network in order to siphon money from the pockets of investors to insiders. Blink claims that "EV drivers can easily charge at any of its 15,000 charging stations," but we estimate that the Company's functional public charging station network consists of just 2,192 stations, a mere 15% of this claim.

5. Culper stated in its report that it sent out investigators who confirmed that Blink's charging stations were not as the Company had represented. Specifically, Culper's report stated, in relevant part:

> [A]lmost no one uses Blink's charging stations, many of which are in utterly decrepit condition. Our on-the-ground visits to 242 stations at 88 locations across the U.S. revealed a plethora of neglected, abused, non-functional, or otherwise missing chargers. Our analysis of the Company's own data suggests that the average charger is utilized for just 6 to 38 minutes per day (0.39% to 2.65% utilization), while annual charging revenue of a mere $6.37 per member suggests that the average Blink member doesn't even obtain one single full charge from the Blink network over the course of an entire year. We think that even at 20x current utilization, Blink's network would continue to incinerate cash. ***In sum, Blink vastly overstates the size, functionality, usage, and economic potential of its chargers.***

(Emphasis added).

6. Culper continued to detail that of the 242 stations its investigators visited in the Atlanta, Chicago, Miami, and San Diego metro areas, twenty-three times (9.5% of total), Blink's map claimed that there were chargers on site, but Culper's investigators were either unable to locate the chargers or locate all of the chargers claimed. In thirty-nine cases (16.1% of total), Culper's investigators "found chargers that, even though they existed, were visibly damaged and/or non-functional," and that "[a]s many of these chargers have been left to the elements for close to a decade, the most common deformities were due to sun and heat damage." Furthermore, in another eighteen cases (7.4% of total), Culper's investigators "found that chargers were inaccessible to the general public," and that "[m]any of these were behind locked garages, or restricted only for employee (in office buildings) or resident (in condo or apartment buildings) use only." Culper concluded: "**In short, our sampling suggests that of the 3,275 chargers listed on the Company's map, only 67% of these, or 2,192 exist, are functional, and are publicly accessible.**" (Emphasis in original).

7. The Culper report included photos, from multiple locations, of Blink chargers that were severely damaged, inaccessible, and/or non-functional. It also included details of interviews with parking attendants and other locals who described the lack of use and/or other issues experienced with the Blink chargers.

8. Also on August 19, 2020, analyst Mariner Research Group ("Mariner") published another report that was highly critical of Blink. Mariner wrote that Blink's "revenue growth has significantly seriously lagged the EV industry – yet CEO Farkas made >$7M in compensation during this period. We believe that this is due to persistent issues around product quality, customer churn, and user experience, and believe that these issues will continue to hamper [Blink]'s growth."

9. Mariner concluded: "[W]e believe the business should be valued at its liquidation, or book value, of just 17c in a downside scenario and at $2 a share in a bull case scenario . . . . The average of our price targets produces a base case target of $1.09, a drop of 91% from the 8/18/20 close."

10. On this news, Blink's stock price fell from its August 18, 2020 closing price of $10.23 per share to an August 20, 2020 closing price of $7.94 per share. This represents a two day drop of approximately 22.4%. Indeed, the intraday price on August 20, 2020 reached as low as $6.42 per share.

11. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) many of Blink's charging stations are damaged, neglected, non-functional, inaccessible, or non-accessible; (ii) Blink's purported partnerships and expansions with other companies were overstated; (iii) the purported growth of the Company's network has been overstated; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**JURISDICTION AND VENUE**

12. The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District

so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

16. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17. Plaintiff, as set forth in the attached Certification, acquired Blink securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18. Defendant Blink purports to be "a leading owner, operator, and provider of electric vehicle ('EV') charging equipment and networked charging services. Blink offers both residential and commercial EV charging equipment, enabling EV drivers to easily recharge at various location types." Blink common stock trades in an efficient market on the NASDAQ stock exchange under the ticker "BLNK." The Company's headquarters are located at 407 Lincoln Road, Suite 704, Miami Beach, FL 33139, and the Company is incorporated under the laws of the State of Nevada.

19. Defendant Michael D. Farkas ("Farkas") is Blink's Founder, Executive Chairman, and Chief Executive Officer ("CEO").

20. Defendant Michael P. Rama ("Rama") is Blink's Chief Financial Officer, having served in that capacity since February 10, 2020. He previously acted as an "independent financial consultant" for Blink from July 2019.

21. Collectively, Defendants Farkas and Rama are referred to throughout this complaint as the "Individual Defendants."

22. The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

23. Blink was incorporated in 2006 as "New Image Concepts, Inc." In 2009, the Company became known as Car Charging Group, and was founded in the busines of operating EV charging stations at various locations throughout the U.S.

24. Blink was founded by Defendant Farkas, who filled the role of CEO from its foundation until approximately 2015, and then resumed that role in 2018.

25. According to its most recent Annual Report filed on Form 10-K with the SEC, Blink purports to be "a leading owner, operator, and provider of [EV] charging equipment and networked charging services. Blink offers both residential and commercial EV charging equipment, enabling EV drivers to easily recharge at various location types."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

26. The Class Period begins on March 6, 2020, when Blink issued a press release entitled "Blink Charging Partners with One of Nation's 50 Fastest Growing IT Firms to Deliver Charging Stations into Florida's Booming Tech Hub." In this release, Blink referred to itself as "a leading owner and operator of [EV] charging equipment and services."

27. In this March 6, 2020 release, Defendant Farkas stated: "[w]ith this agreement, we continue to expand and monetize our network of stations throughout the country." The release further provided that "Blink Charging . . . is a network leader in [EV] charging equipment and networked EV charging stations, enabling EV drivers to easily charge at any of its 15,000 charging station [*sic*]." In its March 17, 2020 press release, Blink repeated its line about its EV charging equipment and networked EV charging stations "enabling EV drivers to easily charge at any of its 15,000 charging" stations in numerous press releases in 2020.

28. In other of its 2020 press releases, Blink has stated that it "has deployed over 23,000 charging stations, many of which are networked EV charging stations, enabling EV drivers to easily charge at any of its charging locations worldwide."[1]

29. On April 2, 2020, Blink filed its 2019 Annual Report on Form 10-K with the SEC. For the year ended December 31, 2019, Blink reported total revenue of $2.8 million and charging service revenue for company-owned charging stations of $1.4 million. It reported a net loss for the year of $9.6 million, or $0.37 per share, as compared to a net loss of $3.4 million for the year ended December 31, 2018.

---

[1] *See, e.g.*, https://ir.blinkcharging.com/news-events/press-releases/detail/2237/ev-industrys-leading-news-source-insideevs-com-praises (March 26, 2020, last visited on August 26, 2020); https://ir.blinkcharging.com/news-events/press-releases/detail/2238/blink-charging-founder-and-ceo-michael-d-farkas-to-speak (April 1, 2020, last visited on August 26, 2020); https://ir.blinkcharging.com/news-events/press-releases/detail/2240/blink-charging-unveils-first-to-market-portable-emergency (April 6, 2020, last visited on August 26, 2020).

30. In association with the filing of its 10-K, Blink also issued a press release on April 2, 2020. In this release, Defendant Farkas lauded that Blink had "invested in the upgrade and large-scale improvements of [the Company's] proprietary Blink network to ensure scalability and reliability with future demand surges." This release also provided that "Blink . . . is a leader in [EV] charging equipment that has deployed over 23,000 charging stations, many of which are networked EV charging stations, enabling EV drivers to easily charge at any of its charging locations worldwide."

31. The Individual Defendants both submitted two signed certifications in association with Blink's April 2, 2020 filing of its 2019 Annual Report on Form 10-K. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report." The Individual Defendants further certified that "[t]he information contained in such Annual Report on Form 10-K for the year ended December 31, 2019, fairly presents, in all material respects, the financial condition and results of operations of Blink Charging Co."

32. On May 13, 2020, Blink filed its First Quarter 2020 financial report on Form 10-Q with the SEC. Blink reported total revenue for the first quarter of $1,298,864, and a net loss of $2,961,100, or $0.11 per share, compared to a net loss of $1,893,627 in the first quarter of 2019.

33. Also on May 13, 2020, Blink filed a press release announcing its first quarter 2020 financial results. Defendant Farkas included a quote in this release, that "[w]e are encouraged to see the results of our investments in the Company in 2019. Corporate investments include the

development of additional EV charging products, nationwide equipment deployments, Blink network enhancements, and corporate resources that have accelerated the growth in early 2020."

34. The Individual Defendants both submitted two signed certifications in association with Blink's May 13, 2020 filing of its First Quarter 2020 report on Form 10-Q. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report." The Individual Defendants further certified that "[t]he information contained in such Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, fairly presents, in all material respects, the financial condition and results of operations of Blink Charging Co."

35. On June 25, 2020, Blink issued another press release entitled "Blink Applauds Apple's Addition of Electric Vehicle Charge Routing Capabilities in Updated Apple Maps for iOS 14," in which Blink repeated its statement that the Company "has deployed over 23,000 charging stations, many of which are networked EV charging stations, enabling EV drivers to easily charge at any of the Company's charging locations worldwide." In this release, Defendant Farkas stated that Apple's changes "will help enable EV drivers to take to the road with the confidence that their charging needs can be met and will make it even easier for EV drivers to benefit from Blink's growing network of charging stations."

36. On July 8, 2020, Defendant Farkas appeared on *The Watchlist*. In this video, Defendant Farkas stated that Blink is "the largest, from a scale size. There are some smaller [network operators] who have a smaller amount of locations, but we're in a lot more areas."[2]

---

[2] *See* https://www.youtube.com/watch?reload=9&v=8MOtPc-jaBg&feature=youtu.be&t=152 (last visited on August 26, 2020).

37. On August 4, 2020, Blink issued a press release (that it did not file with the SEC) announcing a purported agreement with real estate services firm Cushman & Wakefield ("C&W") "for the marketing and potential deployment of Blink charging stations . . . and related services to [C&W] clients throughout the United States."

38. Then on August 13, 2020, Blink filed its Second Quarter 2020 financial report on Form 10-Q with the SEC. Blink reported total revenue of $1.3 million for the quarter, and a net loss of $3.0 million, or $0.11 per share, as compared to a net loss of $2.2 million in the second quarter of 2019.

39. Also on August 13, 2020, Blink issued a press release announcing its second quarter 2020 financial results. Defendant Farkas included a quote in this release that the Company has "entered into some significant partnerships, including with leading global real estate firm [C&W], for the marketing and potential deployment of Blink charging stations and services across their client locations throughout the U.S."

40. The Individual Defendants both submitted two signed certifications in association with Blink's August 13, 2020 filing of its Second Quarter 2020 report on Form 10-Q. In these certifications, the Individual Defendants stated that "[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements are made, not misleading with respect to the period covered by this report." The Individual Defendants further certified that "[t]he information contained in such Quarterly Report on Form 10-Q for the quarter ended June 30, 2020, fairly presents, in all material respects, the financial condition and results of operations of Blink Charging Co."

41. The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose that: (i) many of Blink's charging stations are damaged, neglected, non-functional, inaccessible, or non-accessible; (ii) Blink's purported partnerships and expansions with other companies were overstated; (iii) the purported growth of the Company's network has been overstated; (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

42. The statements described in ¶¶ 25-40 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

## THE TRUTH EMERGES

43. On August 19, 2020, analyst Culper published a report entitled "Blink Charging Co. (BLNK): You Won't Miss It." Culper wrote, in relevant part:

> [W]e believe that [Blink] has vastly exaggerated the size of its EV charging network in order to siphon money from the pockets of investors to insiders. Blink claims that "EV drivers can easily charge at any of its 15,000 charging stations," but we estimate that the Company's functional public charging station network consists of just 2,192 stations, a mere 15% of this claim.

44. Culper stated in its report that it sent out investigators who confirmed that Blink's charging stations were not as the Company had represented. Specifically, Culper's report stated, in relevant part:

> [A]lmost no one uses Blink's charging stations, many of which are in utterly decrepit condition. Our on-the-ground visits to 242 stations at 88 locations across the U.S. revealed a plethora of neglected, abused, non-functional, or otherwise missing chargers. Our analysis of the Company's own data suggests that the average charger is utilized for just 6 to 38 minutes per day (0.39% to 2.65% utilization), while annual charging revenue of a mere $6.37 per member suggests that the average Blink member doesn't even obtain one single full charge from the Blink network over the course of an entire year. We think that even at 20x current utilization, Blink's network would continue to incinerate cash. ***In sum, Blink vastly overstates the size, functionality, usage, and economic potential of its chargers.***

11

(Emphasis added).

45.     Culper continued to detail that of the 242 stations its investigators visited in the Atlanta, Chicago, Miami, and San Diego metro areas, twenty-three times (9.5% of total), Blink's map claimed that there were chargers on site, but Culper's investigators were either unable to locate the chargers or locate all of the chargers claimed. In thirty-nine cases (16.1% of total), Culper's investigators "found chargers that, even though they existed, were visibly damaged and/or non-functional," and that "[a]s many of these chargers have been left to the elements for close to a decade, the most common deformities were due to sun and heat damage." Furthermore, in another eighteen cases (7.4% of total), Culper's investigators "found that chargers were inaccessible to the general public," and that "[m]any of these were behind locked garages, or restricted only for employee (in office buildings) or resident (in condo or apartment buildings) use only." Culper concluded: "**In short, our sampling suggests that of the 3,275 chargers listed on the Company's map, only 67% of these, or 2,192 exist, are functional, and are publicly accessible.**" (Emphasis in original).

46.     The Culper report included photos, from multiple locations, of Blink chargers that were severely damaged, inaccessible, and/or non-functional. It also included details of interviews with parking attendants and other locals who described the lack of use and/or other issues experienced with the Blink chargers.

47.     The Culper report also raised questions about Blink's agreement with C&W "for the marketing and potential deployment of Blink charging stations." According to Culper, "C&W made no commitment to charger installations at existing properties, nor did C&W commit to install a certain number of chargers in the future." Importantly, Blink did not file a Form 8-K press

release with the SEC announcing the deal with C&W, so either the deal with C&W is immaterial, non-existent, or Blink failed in its disclosure duties.

48. Culper also noted that, since 2018, **seven executives or directors** left the Company: (1) James Christodoulou, former Chief Operating Officer (August 2018 to March 2020); (2) Jonathan New, former Chief Financial Officer (June 2018 to February 2020); (3) Robert C. Schweitzer, former Director (July 2017 to August 2019); (4) Grant E. Fitz, former Director (August 2018 to August 2019); (5) Ira Feintuch, former Chief Operating Officer (March 2015 to October 2018); (6) Andrew Shapiro, former Director (April 2014 to June 2018); and (7) Andy Kinard, former Director and President (November 2009 to March 2018).

49. Also on August 19, 2020, analyst Mariner published another report that was highly critical of Blink. Mariner wrote that Blink's "revenue growth has significantly seriously lagged the EV industry – yet CEO Farkas made >$7M in compensation during this period. We believe that this is due to persistent issues around product quality, customer churn, and user experience, and believe that these issues will continue to hamper [Blink]'s growth."

50. Mariner concluded: "we believe the business should be valued at its liquidation, or book value, of just 17c in a downside scenario and at $2 a share in a bull case scenario . . . . The average of our price targets produces a base case target of $1.09, a drop of 91% from the 8/18/20 close."

51. On this news, the Company's stock price fell from its August 18, 2020 closing price of $10.23 per share to an August 20, 2020 closing price of $7.94 per share, representing a two day drop of $2.29 per share, or approximately 22.4%.

**CLASS ACTION ALLEGATIONS**

52. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise

13

acquired Blink securities during the Class Period (the "Class"). Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

53. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 12, 2020, Blink had 31,626,616 shares of common stock outstanding.

54. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether Defendants violated the Exchange Act;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of the Company's securities was artificially inflated; and

    f. The extent of damage sustained by Class members and the appropriate measure of damages.

55. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

56. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

58. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b. The omissions and misrepresentations were material;

    c. The Company's securities traded in efficient markets;

    d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    e. Plaintiff and other members of the class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

59. At all relevant times, the markets for the Company's securities were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

60.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

61.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

62.     On August 19, 2020, Culper issued its report as detailed herein. On this news, the price of Blink stock fell from its August 18, 2020 close of $10.23 per share, to an August 20, 2020 close of $7.94 per share (reaching an intraday low of $6.42 per share on August 20, 2020). This represents a two day drop of approximately 22.4%.

63.     These revelations contradicted statements made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

64.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65.     During the Class Period, Defendant Blink and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

66. Defendant Blink and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

67. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

68. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory and punitive damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D. Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated:  September 1, 2020Respectfully submitted,

**SHEPHERD, FINKELMAN, MILLER & SHAH, LLP**

/s/Jayne A. Goldstein
Jayne A. Goldstein (Fl. Bar No. 144088)
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
EMAIL:  jgoldstein@sfmslaw.com

**96599POMERANTZ LLP**
James M. LoPiano
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jlopiano@pomlaw.com

***Attorneys for Plaintiff***